## WILLIAM SHARPE *et al.* v. JAMES C. WILLIAMS.

1. TRESPASS — *Liability.* All joint trespassers are liable civilly for the injuries inflicted by their unlawful acts.

2. ——— *Aiding and Abetting Trespass.* It is not necessary that all be present participating personally in the trespass. One who aids, encourages and abets those who commit the unlawful acts is equally liable as the actual participants.

3. ——— *Liability for Damages.* Where the father of those who personally helped in the ducking of a school-teacher countenanced and encouraged the unlawful purpose, he will be liable for the damages inflicted.

4. ——— *Release of One Joint Trespasser.* Where the attorney for the plaintiff in an action for injuries sustained by an assault and battery agrees conditionally, after an action has been commenced, to dismiss

it against one of the joint trespassers without the knowledge or subsequent assent of the plaintiff, it will not release the other defendants.

5. JURORS—*Statements after Verdict—Hearsay Evidence.* The statements made by jurymen, after the verdict has been rendered, of what was said to them during the trial, is hearsay, and when the testimony of the jurymen themselves is not offered, should not be considered.

*Error from Wilson District Court.*

DURING the winter of 1884 and 1885, James C. Williams, defendant in error, was teaching school in district number 64, Wilson county. Among his pupils were Dayton Sharpe, Philip Starr, J. E. Anderson, E. S. Carter, and John Beaumont jr. On the 27th of January, 1885, they asked the teacher to promise to treat; he declined to make them any promise, and stepping out of the school-room to get a bucket of coal, they locked him out. After parleying with the boys, and trying in vain to get into the school-room, he went away without teaching that afternoon; the next morning these young men went early to the school-house, carried in enough coal to last during the day, and locked the door against the teacher, who, coming at the proper time to open school, was unable to get into the school-room, and after some efforts to obtain possession, finally went to the director of the school district for assistance; they, going to the school-house together, obtained possession of the room, and the teacher taught school during the day. When school was opened the five young men heretofore mentioned left the school-house, and went to their several homes. At four o'clock they returned to the school-house and told the teacher he must treat or they would duck him; he again declined to promise them to treat, and they compelled him to go with them to a creek about one-half a mile from the school-house. There was no great force used in compelling him to accompany them; it appears, however, that two of the young men were stronger than the teacher, two of about the same size and strength, and one, John Beaumont jr., was about thirteen or fourteen years old. He went without serious outcry or resistance to a place called the

"baptizing-hole," in the creek, where a basin was chopped out
in the ice by the young men, long enough and wide enough
to place a full-grown person in, and a hole cut in the bottom
of it, so that it filled with water; then they gave the teacher
permission to remove his overcoat, watch, and valuable papers,
took him by force, laid him in the water, turned him over
therein, and thoroughly saturated his clothing. Williams
then put on his overcoat, got upon his horse and rode to his
home about three miles distant, getting very cold in his frozen
clothing before he reached there; the thermometer was several
degrees below zero.

There is considerable testimony as to the extent of his in-
juries. He himself testified that he has been unable to do
any continued manual labor since the ducking, and that it
gave him pain to perform the ordinary duties of teaching
school, especially where it required any unusual mental activity;
that his back has been sore and lame, and that he has not the
full use of his left arm and leg; he also testified that he had
chronic cerebro-spinal meningitis, claimed to have been pro-
duced by the ducking. Two physicians partially corroborated
his statement. He further testified that he had had trouble
with his ears from an attack of measles in his boyhood, and
that he had nearly outgrown the trouble before this ducking,
but since, the malady had broken out afresh and his hearing
has been impaired and the running sores reappeared.

William Sharpe, plaintiff in error and one of the defend-
ants in the trial court, is the father of Dayton Sharpe and
stepfather of Philip Starr. He was made a defendant upon
the theory that he had aided and encouraged the boys in
ducking the plaintiff. The testimony concerning William
Sharpe's connection with the assault is substantially as follows:
The boys coming home the morning they had locked the teacher
out, told Mr. Sharpe that they intended to duck the teacher
if he did not promise to treat. Mr. Sharpe testified that he
told them they better not do it, but they seemed so determined
about it that he said, "Well, if you are going to do it you
had better go and see old Mr. Anderson, [who was grandfather

of one of the young men engaged in this matter,] and if. he will pay half of the costs if you get into any trouble in the matter, I will pay the other half; but if Mr. Anderson won't agree to this, then you had better let it alone." The boys went to see Mr. Anderson, but he seemed to be so adverse to any violence to the teacher that they left him without making the proposition that Mr. Sharpe told them to, and without seeing Mr. Sharpe again went and ducked the teacher as above described. The other testimony on this point is, that shortly after this transaction all the five boys engaged in the ducking were arrested, together with William Sharpe, and all appeared before a justice of the peace in Wilson county, where they pleaded guilty, with the exception of John Beaumont jr., and paid their fines. The money for the fines and costs was very largely paid at the time by William Sharpe, although he testified the boys were to refund the money to him when they might get it. Mr. Sharpe testified that although he paid his fine, and the record shows that he pleaded guilty, yet he did so for the purpose of avoiding further trouble and getting rid of the matter. He stated that when the charge was read to him by the justice he told him he was not guilty; that he was not within a mile of the place where they ducked the teacher, and proceeded to tell the justice what he had told the boys in the morning, when the justice interrupted him and said, "You are as guilty as any of them;" he stated that he did not consider himself guilty, but to avoid further trouble and expense he would allow the plea to be entered that way, and paid his fine. Saturday of the week the boys ducked the teacher, Mr. Sharpe was at the country post office near where he lived, and while there got into a conversation with a Mr. Young, which Mr. Dewey, the postmaster, overheard, and testified to on the stand as follows:

"Mr. Young says, 'Mr. Sharpe, had you advised the boys to go and duck Jim?' and he says, 'I couldn't really believe it, but I was told so;' and Mr. Sharpe says, 'Well, I told the boys that if they would go down and get Mr. Anderson to pay part of the costs, I would pay the balance if there was any,

and duck him.' Mr. Young seemed very much surprised indeed that a man in his position advising boys to do any such act, or to commit any such act. Mr. Sharpe said he thought it was all in fun; 'I didn't know as it would really amount to much, as Jim would not treat, and the boys thought he ought to treat; wanted to duck him because he wouldn't treat.' He said he didn't think there was much harm in it, or wrong about it."

And further, Mr. Sharpe had a conversation with Mrs. Anderson, the mother of one of the young men, who testified she met him, William Sharpe:

"Of course we used to be old neighbors, and I asked him, 'What kind of a scrape have you got us into there?' John is my oldest son. He said he didn't know as he had got us into a scrape. Said I, 'Didn't you send your boys down to Anderson's, and tell them to tell him if he would stand half the costs, you would stand the other half, and have him ducked?' He said, 'Yes.' I said, 'What did you do that for?' 'Well,' he says, 'Williams ought not to be so contrary.' And I says, 'This is giving the teacher into the hands of the children instead of the children into the teacher's hands.' And he says, 'The children thought he was so contrary.' And I says, 'I don't approve of such as that.' And he says, 'You go down to Mr. Anderson, your father-in-law, and ask him about it.' He says, 'He is living there all winter, and knows all the work.' He says, 'My boys thought George was right, and of course they turned against Mr. Williams.'"

The findings of the jury on this phase of the case were that William Sharpe aided, counseled, abetted, and advised the ducking of Williams; that he approved of locking the teacher out of the school-room; took no steps to restrain them from ducking him, and abetted them by saying he would pay half the costs; that he encouraged the boys in carrying out their plans, etc., etc. At the trial there was testimony introduced for the purpose of showing that plaintiff had settled the matter with one of the defendants, John Beaumont jr., through his father John Beaumont sr. The plaintiff employed T. J. Hudson esq. as his attorney. Mr. Beaumont in the absence of Mr. Williams called upon Mr. Hudson for the purpose of releasing his boy from this charge. He told Mr.

Hudson that his boy was innocent; that he was a mere lad, only thirteen years of age; that he went with the others out of curiosity, took no part in the outrage, as he called it, and that he had been discharged by the justice on the criminal complaint, and that he, the father, was going west, and wanted to settle the matter up and dispose of it before he left. After considerable talk, the following writing was executed and given to Mr. Beaumont:

"Whereas, John Beaumont jr. was charged with aiding and abetting an assault on James C. Williams; and whereas, he is a minor only 13 years of age; and whereas, he was released by Justice Platt when charged with said assault; and whereas, there are grounds for believing he was not to blame for said assault; and whereas, his father, John Beaumont, wants to move away, we therefore consent to drop his name from said charge for damages, and agree to dismiss as to said John Beaumont and the father when the case is called, without costs.

(Signed) JAMES C. WILLIAMS.
By T. J. HUDSON."

Mr. Beaumont had an interview with plaintiff in the presence of Hudson, in the afternoon of the day this instrument was signed, without coming to any definite arrangement or conclusion, and the testimony shows that Mr. Hudson said he would look the matter over, and let Mr. Beaumont know the next week of his decision if he would call, but that he did not call. At the time this paper was signed Mr. Beaumont left two certified checks for $25 each, with Mr. Hudson. Beaumont contends that he left them there as consideration for this agreement. Mr. Hudson denies that they were left there for that purpose; that any allusion to consideration was purposely left out of the writing; and further, that the matter was subject to the ratification of Mr. Williams. Mr. Williams was not told, and did not find out until three or four months afterward, that the checks had been left with Mr. Hudson. Sometime in August Hudson turned them over to plaintiff, who took them home with him; his father presented them at the bank, not for payment as plaintiff testified, but to ascertain whether they would be honored, and found they would be;

shortly after he turned them back to Hudson and told him he would not take them. Hudson notified Beaumont that they were in his office, subject to his order; he afterward wrote a letter intending to inclose them, but his clerk failed to put them in the envelope, and they were not sent. Hudson testified that it was his custom to put in the bank every night all the money and checks he received during the day, but never deposited these.

The findings of fact on this question were voluminous; among others are the following:

"9. Did T. J. Hudson, the plaintiff's attorney, have any authority other than that of an attorney to prosecute plaintiff's case when he signed his name to the agreement to dismiss the case against defendant Beaumont? *Ans.:* No.

"10. Did the plaintiff or his attorney promise or agree to dismiss the case as to any of the defendants except the defendant Beaumont? A. No."

"13. And did not Williams agree and ratify the contract on being assured that it would not affect the case? A. No."

"17. Did the father of the defendant Beaumont, after plaintiff's attorney had given him the papers agreeing to dismiss the suit as to the defendant Beaumont, look up the plaintiff and invite him to the office of said attorney, and while there, upon being informed concerning the contents of said paper, did the plaintiff in substance say that he would have nothing to do with it, and refuse to consent to it? A. Yes."

The case was tried by a jury, at the February term, 1886, and a verdict rendered for $3,000 damages against the defendants. Afterward $1,500 thereof was remitted by the judge, and a judgment rendered and entered for $1,500.

*S. S. Kirkpatrick,* for plaintiffs in error.
*Hudson & Reed,* for defendant in error.

Opinion by HOLT, C.: We are confronted at the threshold of the examination of this action, with the claim that there has been a settlement between plaintiff and John Beaumont jr., one of the defendants. The defendants claim the law to be, where several unite to do an unlawful act, and in fur-

therance of the common purpose another is injured, they all are jointly liable for the injury done, "and there could be no severance of the liability of those who committed or aided in the commission of the trespass," and say if the plaintiff absolutely released one of the joint trespassers from his liability and made a full settlement therefor with him, it would not only discharge the one intended to have been released but all the others as well, who were engaged in the assault upon plaintiff. The plaintiff, without disputing the law to be as claimed by defendants when there has been a settlement for the cause of action, contends that construing the written instrument signed by Hudson favorably for defendants it is at most only an agreement to dismiss the action against John Beaumont jr.; and claims further, that while a release and settlement of a cause of action with one who assisted in inflicting the injury might relieve all others who participated or aided in its commission, yet where the agreement was merely to dismiss the action pending against one of the defendants, or not to sue, it would affect only the one with whom the agreement was made. Plaintiff further claims that Mr. Hudson, when he executed the instrument in writing, had no authority to make any settlement of the character claimed by the defendants; that his authority as attorney for plaintiff simply gave him power to prosecute the action in the courts and not to settle it otherwise. (*Jones v. Inness*, 32 Kas. 177.)

It is unnecessary in this opinion to determine or discuss either of these legal propositions, for the findings, supported by substantial testimony, establish the fact that Mr. Hudson never intended to make a settlement of the cause of action against the defendants or either of them; it also appears that whatever talk there may have been between him and John Beaumont sr. about dismissing the action against John Beaumont jr., it was subject to his approval when Beaumont should call again, which he never did. Moreover, it is shown by the evidence and found by the jury that the plaintiff did not give his assent to what defendants claim was an agreement, in any of its phases. Therefore we are of the opinion there was no

agreement or understanding which would preclude the plaintiff from prosecuting his action against any one or all of the defendants.

This action was brought here by William Sharpe alone. It is in evidence that he was the only defendant against whom a judgment would be of any value. The other defendants are insolvent, and the main question practically in this case is, whether the defendant William Sharpe aided, abetted, and encouraged the assault upon the plaintiff? The evidence on this point comes wholly from Mr. Sharpe himself, and his co-defendants, Dayton Sharpe, his son, and Philip Starr, his stepson. When we say it comes from William Sharpe himself, we include the statements that he made in the presence of Dewey, the postmaster, and to Mrs. Anderson, and his action before the justice of the peace. That part of the evidence most favorable to Mr. Sharpe shows that he knew of the intention of his son and stepson to take part in the criminal assault upon the teacher of the school in the district where he lived; his efforts to restrain them were feeble; in fact, considering all his own testimony alone, it might fairly be presumed that he had no objections to the "fun," as he termed it. He stated to them that if they were determined to go ahead in the matter, they should see the grandfather and guardian of one of the other boys about to be engaged in this unlawful purpose, and if he would consent to pay one-half of the costs, he would pay the other half. It is not the intention of this opinion to attempt to lay down the rule of what should be a proper degree of restraint by the parent over his child when he has reason to think that the child is about to engage in an unlawful act; it is well enough to say, however, there is an element in this case which distinguishes it from *Edwards v. Crume*, 13 Kas. 348, in which it is held that a father is not liable for the wrongful acts of his minor son of which he knew nothing before or at the time of their commission. In this case William Sharpe knew of their intentions to commit a crime, and with that knowledge he "restrained them not." His relation to them imposed upon him certain duties and liabilities different

from those of one who had no control over them. ( *Hoverson v. Noker*, 60 Wis. 511; *Strohl v. Levan*, 39 Pa. St. 177; Schouler's Dom. Rel. 361.)   But this question is very largely eliminated from the case by the answers of the jury to the questions of fact submitted to them, in which they find that the defendant William Sharpe, aided, abetted, and encouraged the other defendants in this assault.   When it is established that one aids, abets, and encourages others in the commission of a misdemeanor, he is guilty as principal under the law, and all are liable in a civil action for any damages that may have resulted from their crime.

One of the most serious questions of the case is whether or not the findings of the jury on this point are supported by substantial evidence.   The volume of the testimony is in support of the naked statement made by Sharpe himself; he is corroborated by his son and stepson; but it does appear that he made some admissions directly after this affair took place, and when he thought it a good joke, that are not consistent with his version of his talk with the boys.   His statements at the post office of what he said to the boys were more in the nature of encouragement than of reproof.   He said, " Well, I told the boys that if they would go down and get Mr. Anderson to pay part of the costs, I would pay the balance, if there was any, and duck him."   And of like character was his conversation with Mrs. Anderson, mother of one of the defendants, who, upbraiding him for getting her boy into trouble, said: " Didn't you send your boys down to Anderson's, and tell them to tell him if he would stand half of the costs you would stand the other half, and have him ducked?" and he answered, " Yes."   In both of these conversations there was an admission that it was understood between him and the boys that the teacher was to be ducked.   From one we learn that he told the boys to "duck him," and from the other, to "have him ducked."

The defendants claim there was a condition imposed in the direction or assent to have the plaintiff ducked which would relieve defendant William Sharpe of his liability.   But the

condition is a peculiar one, and one which the law would not tolerate in such a transaction as this, where they were planning to do an unlawful act; and when it comes from a father to his own son and stepson it is more in the nature of a permission than a restraint. In fact we feel justified in saying, that taking all his directions together, they could well be considered by them as an approval of their plans, and were such as would incite and encourage them to execute their unlawful purposes.

His appearance before the justice of the peace, pleading guilty to the criminal charge against him, paying his own fine and those of the boys, has great weight with us in supporting the findings of the jury. It appears in evidence that this matter was discussed before the justice, and knowing all the circumstances he was willing to allow the records of the justice to show a plea of guilty on his part. We have noted his excuses and explanations for his action there, but his actions are stronger proof to us than his statements of why he did so. Upon the whole record we believe the findings of the jury, that defendant William Sharpe did aid, abet, counsel and advise the ducking of plaintiff, are supported by sufficient testimony to sustain a judgment thereon.

The defendants further complain of the ninth instruction of the court, which is as follows:

"9. The evidence shows that defendant Dayton Sharpe is the son of defendant William Sharpe, and that defendant Philip Starr is a stepson of said William Sharpe, and at the time of the alleged commission by them of the injuries complained of said Dayton Sharpe and Philip Starr were both minors and living with and members of the family of said William Sharpe; under these circumstances said William Sharpe occupied toward his stepson, Philip Starr, as well as toward his own son, Dayton Sharpe, the relation of a parent. The general rule of law, is that a parent is not liable for the torts or wrongs of his children; yet should you believe from the evidence in this case that said William Sharpe knew of the intentions of Dayton Sharpe and Philip Starr, with others, to inflict on plaintiff the injuries complained of, and said William Sharpe made no effort to dissuade his said sons therefrom,

and if you should likewise and further believe that with such knowledge of their intentions as aforesaid he encouraged and incited them to do the act complained of, and sanctioned the doing of the same, then he would be liable equally with the others, defendants in this case, for all damages the plaintiff may have sustained by reason of the injuries complained of."

They complain of this part of the instruction:

"William Sharpe made no efforts to dissuade his said sons therefrom; and if you should likewise and further believe that with such knowledge of their intentions as aforesaid he encouraged and incited them to do the act complained of, and sanctioned the doing of the same, then he would be liable equally with the others, defendants in this case, for all damages the plaintiff may have sustained by reason of the injuries complained of."

- They claim that the fact that William Sharpe failed to dissuade his sons from committing this offense would not make him liable for the injuries they inflicted upon the plaintiff. From the phraseology of the instruction such an inference is not fairly deducible. For it is stated, "and if you should likewise and further believe that with such knowledge of their intentions as aforesaid he encouraged and incited them," etc. The instruction does not say if he made no effort to dissuade them he would be liable, but if he made no effort to dissuade them, and did encourage and incite them, he would be liable equally with the others. They claim the word "sanctioned" means ratifying and approving the act after it was done, and being so used and construed was erroneous in the instruction, as his liability could not be made contingent upon his approval of the act after its completion. However, the word "sanctioned" may have had reference to the countenancing and approval of the plans of the boys after they were formed and before they were consummated. This instruction, if erroneous as claimed by the defendants, and we are not prepared to say it is, could at most have been only misleading; and there is proof positive that it did not mislead the jury, for the reason that the jury found that this defendant did incite, encourage and counsel the plans of the boys in committing this assault.

The defendants in their motion for a new trial alleged as one of the grounds therefor the prejudice of the jury, and supported it with this affidavit, made by one of the attorneys for defendants:

"The affiant further says, soon after the verdict of the jury was returned in this action several of the jurors were talking in the ante-room of the court house, in which some of them remarked that they wondered if the defendants, the boys that had ducked the school teacher, would carry out their threats to ride the jury on a rail in case they found a verdict against them. I then asked if such threats had been made, and two or three of the jury replied 'Yes;' when they were passing in and out of the court house they had heard some of the defendants, that is, the boys that had done the ducking, remark that if the jury found a verdict against them, they would ride the jury on a rail."

We think that this affidavit, setting forth what the jury said after the verdict, is hearsay. Affiant says two or three jurymen told him that they had heard threats made by some of the defendants, not William Sharpe, that if they returned a verdict against them they would ride the jury on a rail. None of the jurymen themselves, however, testified by affidavit or otherwise in support of the motion. This affidavit was used for the purpose of showing the verdict was the result of the prejudice of the jury. We cannot treat it as evidence, nor can we agree with the defendants that there is any evidence in the amount of the verdict itself which would induce us to believe that it was the product of prejudice against defendants. The court remitted one-half thereof, probably for valid reasons, but from the record as it comes before us we are not prepared to say that the verdict is excessive.

There is evidence showing that the injuries to plaintiff are serious and permanent. The action of the boys was brutal, and under all the environments of the case we think the judgment is reasonable in amount.

We recommend that the judgment be affirmed.

By the Court: It is so ordered.

All the Justices concurring.